JOSEPH H. TOOKER, JR., Respondent, *v.* THE SECURITY TRUST COM-
PANY, Appellant.

*Life insurance — waiver of a cash payment of the premium — estoppel — omission
from a health certificate of a consultation with a physician for a trivial sore on the
head — effect of paying another policy upon the same life under the same state of
facts.*

Where a life insurance company has, on several occasions, allowed a person to
solicit policies for it, and has permitted him to deliver them without exacting
payment in cash on the delivery of the premium receipt, as required by the
terms of the policy, it constitutes him its agent with authority to waive the
condition requiring payment in cash; and where such agent accepts in return
for a policy notes of the son of the insured, and, within a week thereafter,
accepts for the notes the check of the wife of the insured, and thereupon
delivers the premium receipt, the insurer is estopped from subsequently deny-
ing the due receipt of the premium.

A failure to embody in a health certificate, accompanying the application for the insurance, a statement made to the agent by the insured that he had been treated by a physician for an unimportant sore on his head, does not constitute a breach of a warranty contained in the application in the technically untrue answer to a question therein as to who was the last physician consulted by the insured. The simple omission of a trivial fact of this kind will not vitiate a policy, particularly where the policy indicates that an omission, which will constitute a breach, must be intentional and fraudulent, and where the policy does not by its terms constitute the soliciting agent the agent of the insured.

*Semble,* that where the insurer, with full knowledge of the facts, pays one of two policies, issued upon the same life and substantially upon the same application, there is a waiver of any invalidity or insufficiency of the proofs of death under the other policy.

APPEAL by the defendant, The Security Trust Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Westchester on the 15th day of May, 1897, upon the decision of the court rendered after a trial at the Westchester Special Term.

*Oliver P. Buel,* for the appellant.

*Wilson Brown, Jr.,* for the respondent.

GOODRICH, P. J.:

The plaintiff is the assignee of a policy of $5,000 insurance written by the defendant, a Pennsylvania corporation, on the life of the plaintiff's father. In January, 1896, the father made application, in writing, to the defendant through Seymour L. Rau for insurance on his life to the amount of $5,000. Two policies of $5,000 each and numbered 597 and 598 were delivered by the defendant to Fleming & Kell, its general agents and managers in the city of New York, who had full power and were authorized by the defendant to effect insurance by such insurance policies upon the life of the insured. Fleming & Kell placed the policies in the possession of one Leach, who handed them to Rau, with whom he was associated in the business. Rau delivered policy 598 to the insured, the first premium being paid simultaneously therewith.

There is evidence tending to show that, although Tooker, the insured, had applied for one policy of $5,000, the defendant, or its agent, was desirous of issuing the second policy, numbered 597, but that such policy, after being held by the agent for some time, was returned to the company, which in place of it issued the policy in

suit, numbered 1,541, and this was also sent to Leach. The original application upon which the first two policies were issued was on March third amended in some particulars to which reference will hereafter be made. The policy in suit was dated May second, and was sent by the defendant to Fleming & Kell, who on May fourth sent it to Leach in a letter reading: "May 4th, 1896. We enclose herewith policies 1541, J. H. Tooker, $5,000. 1542, F. A. Schultz, $5,000. Please have health certificates signed before delivering policies." Leach handed the envelope containing the policy to Rau, who testified that there was no receipt for premium or health certificate in the envelope. On several occasions thereafter Rau endeavored to persuade Tooker to take the policy and pay the premiums, but it was not until the first day of July that the policy was delivered to Tooker or his son, the plaintiff, after Rau had threatened to return the policy to the corporation unless the affair was settled on that day, when, for the premium of $589.50, at the suggestion of Rau two notes of the son were given and the policy delivered to the insured. It appeared that the father was not prepared to pay the premium in cash, and was prevented by the articles of his partnership from giving notes. At this time the insured was apparently in good health. When the notes were given Tooker told Rau that he would pay cash for them within a couple of days. On the third Rau telephoned Tooker for the cash. Tooker told him that he had not given him the premium receipt, and Rau promised to take it up to him on Monday, the sixth, and on that day he handed it to Tooker. On July third, Tooker, after some indiscretions in eating, was suddenly seized with an acute attack of colic, from which, however, he recovered. It will be noticed that the following day, July fourth, was a holiday and July fifth was Sunday. On July sixth the insured was at his office the whole day and apparently in good health. That night he was taken suddenly ill and died on July seventh. On July sixth the plaintiff's notes were taken up and paid by a check of the plaintiff's wife to the order of Rau, and on the same day the company's receipt for premium was handed to Tooker. Rau deposited this check in his own bank account, and on July eighth he sent his check to the general agents of the defendant, who subsequently, and after the death of the insured, returned the same to Rau.

After the death of the insured the other children of the insured and the executors of his will, in consideration of one dollar, assigned to the plaintiff the policy and all their rights thereunder. Proofs of death and interest were delivered to the defendant in the latter part of July, which were received by the company without objection, and the $5,000 due on policy 598 were paid. The company, on December fourth, waived the making and filing of additional proofs of death under the present policy.

The defendant denies that the first premium was ever paid or that the policy ever had inception as a contract, and claims that if the policy was duly delivered and the premium paid, the policy is null and void by reason of breaches of warranty, its main contention being that there were misstatements or omissions in the application for the policy, in that the insured stated in his application that the last physician consulted by him was Dr. Skiff, in 1880, and that this was untrue, he having consulted other physicians at subsequent periods, as late as the months of June and July, 1896. The issues were tried by the court, a jury having been waived, and judgment was entered for the plaintiff. From this judgment the appeal is taken.

The first question relates to the inception of the policy which required the payment of the premium in advance. The policy provides that the premium is payable at the home office of the company in the city of Philadelphia, or that it may be accepted elsewhere in exchange for the company's receipt signed by the president, vice-president, actuary or secretary. The receipt of the company, signed by the vice-president and countersigned on July 6, 1896, "by S. L. Rau, Agent," was delivered to the insured or his representative on July sixth, after the check had been given to Rau for the payment of the notes of July first.

The application and amendment hereafter referred to are on blanks of the company and are signed by Rau as witness, while the premium receipt, also on a blank of the company, is signed by him as agent, and on the back is a clause authorizing the payment of premiums "to an agent producing a receipt therefor signed by the President, Vice-president, Actuary or Secretary, and countersigned by such agent," and there is evidence tending to show that Rau had acted as agent for the company in obtaining several policies of insurance for other persons and that in some of the cases the policies

were delivered by Rau upon receiving the notes of the insured, without payment of the cash. These facts clothed Rau with apparent authority as an agent of the company. The acceptance by Rau of the notes of the son and the delivery of the policy, ratified as it was by the delivery and acceptance of the wife's check for the amount of the premium and the delivery of the premium receipt on the sixth of July, constituted a waiver of the conditions of the policy as to the payment of the premium in actual cash, and it follows as a legal consequence that the policy had its inception on the first day of July. To this extent Rau was the agent of the defendant, and his acceptance of the notes and check estopped the company to deny the receipt of the premium in accordance with the conditions of the policy.

The other defense, that the policy was null and void by reason of breaches of warranty, is based upon the fact disclosed in the proofs of death, by which it appears that in February, 1896, Dr. Forman, who attended the insured in his last sickness, made the following statement: "Q. Were you the attending physician of deceased before his last illness? If so, for what disease or ailment were you consulted, or did you prescribe for, giving dates? Attended him for some trivial ailment (the nature of which I have forgotten) 1893, Feby. 1896. Herpes Zoster Capitis."

The proofs also contained the following statement: "Date deceased first consulted you professionally? July 3, 1896. Except as above mentioned. What was the nature of sickness or ailment? Obstinate constipation with profound collapse. Duration of last illness? Five days including dates of attack and death. Its predisposing causes, together with history and symptoms present during its progress? Can only designate foecal obstruction of bowel — Intermittent pain — collapse. State the immediate cause of death? Heart failure."

The defendant called Dr. Forman as its own witness and he testified that he professionally attended the deceased for some trifling ailment in 1893. His attention was also called to the proofs of loss signed by him, in which he stated that he attended the deceased in February, 1896, for "Herpes Zoster Capitis," and he was asked for a definition of that disease and whether it was what is commonly known as shingles. The witness declined to answer the question

on the ground that it called for expert testimony. The court stated that witness had " a right to take that position," and the defendant excepted. As the witness was called by the defendant, the exception has no validity. No objection to the testimony was made by the defendant, nor did it move to strike out the entire testimony of the witness, and the exception, under these circumstances, is untenable.

The witness also testified as follows: "If my memory serves me correctly in that proof of loss, I think I stated that I saw him several times in 1896 for some trifling ailment, the character of which I had then forgotten. I think that is practically what is in the proof of loss. I say so now. My statement there was true. I made no memorandum of the character of his illness    I remember it as a trifling indisposition."

In the case of *Chinnery* v. *U. S. Industrial Ins. Co.* (15 App. Div. 515) this court held that the statement in the application that the applicant had never been under treatment in any hospital or other institution, though technically untrue because the applicant had at one time been in a hospital under treatment for "eye trouble," which appeared to be for the removal of some substance that had become lodged in her eye, was not within the meaning of the policy so as to invalidate it, as it had nothing to do with the general health of the insured, and if it had been known to the defendant, could not possibly have been considered by it as a reason for refusing a policy of insurance to the applicant.

To the intelligence of the ordinary layman, "herpes zoster capitis" is a disease with a high-sounding name, but there is no evidence in the record as to what it is, and a reference to the standard dictionaries discloses the fact that "herpes" is a cutaneous affection which appears in several forms, and is known among the uninitiated as "shingles;" that the use of the word "capitis" locates the disease upon the scalp, while the Greek word "zoster," meaning a belt or girdle, would seem to locate it in the region of the waist. In the evidence the ailment is sometimes called "herpes zoster capitis," and sometimes "herpes capitis," as if there were no distinction. It is, therefore, difficult to discover from the evidence what was the real ailment. Dr. Forman testified that he prescribed a salve or

ointment; that it was for a trifling indisposition, and that Tooker fully recovered from the trouble. When it is considered that the application contained the statement that the application of the insured for policies in the Mutual Life and Equitable Life Insurance companies had been declined, and that it does not appear in evidence that there was any conference on the subject with either of said companies, it is not difficult to deduce an inference that, as the defendant issued its policy after such statement, the defendant would not have refused to issue its policy if it had known what the applicant had suffered with the ailment referred to. Nor is this evidence conclusive against the plaintiff. The witness was called by the defendant, and the jury may possibly have disbelieved his evidence altogether, as they were entitled to do.

In addition to this, Rau, speaking of the time when the application for the policy was made, testified as follows: "Q. Prior to that time, did he state to you anything about the Herpes Capitis? A. He (the insured) spoke to me about some slight scalp ailment, but he did not use any technical term, and I asked him in a general way if it amounted to anything, and he said no. That was all the conversation. It was a little sore on his head for which the doctor had given him a salve. It did not amount to anything; it was then entirely cured. Q. Did he ask you if it was necessary to mention that? A. In this way: I said that it is so unimportant it is needless to mention it; those little things will happen all the time, and we would be busy filling up forms to contain them, every little cold and everything of that sort."

In this transaction which preceded the issuing of the policy, Rau was acting on behalf of and as the agent of the company. His knowledge was the knowledge of the company and his failure to write in the application the statement made to him by the insured cannot be held to militate against the latter. All the more, that there is not in the policy a condition which so often appears in the reports of insurance cases, that the agent taking the application is the agent of the insured and not the agent of the insurer. (*O'Farrell* v. *The Metropolitan Life Ins. Co.*, 22 App. Div. 495.)

The case does not involve a breach of warranty in the policy. It is at most the omission of a fact, and a fact which the trial court upon the evidence was justified in finding to be a trivial fact.

A similar question arose in the case of *Dilleber* v. *Home Life Ins. Co.* (69 N. Y. 256, 263) where the court held : " When the language used in a policy may be understood in more senses than one it is to be understood in the sense in which the insurer had reason to suppose it was understood by the assured. (*Hoffman* v. *Ætna F. Ins. Co.,* 32 N. Y. 405.) Conditions and provisos must be strictly construed against the insurers, because they have for their object to limit the scope and defeat the purpose of the principal contract ; and as the insurer prepares the contract and furnishes the language used, any ambiguity in the contract must be taken most strongly against him. (*Fowkes* v. *M. & L. Life Ass. Assn.,* 3 Best & Smith [Q. B.], 917.) We are, therefore, of opinion that it was a question of fact to be submitted to a jury, whether the answer of the assured as to the physicians employed or consulted was honestly and fairly made, or whether a portion of the truth was fraudulently and intentionally suppressed or withheld."

In this connection attention must be given to the form of the application. The clauses must be construed together and the intention and agreement of the parties from the whole instrument. The applicant said : " There is no suppression of known facts." " It is hereby covenanted and agreed that if there has been any suppression or omission of any fact, or if any untrue or fraudulent allegations be contained herein or in the foregoing answers," the policy shall be void. Taken together, these clauses clearly relate to some fraudulent or intentional suppression or omission of any known fact. A simple omission resulting from a lapse of memory would not come within the category. There must have been something indicating an intention to deceive the company and to induce it to enter into the contract in order to void the policy.

Bearing in mind this principle, we find that the original application of January seventh stated as follows : " The last physician I consulted or who prescribed for me was Dr. Geo. B. Skiff, of N. Y. City, in the year 1880, for the sickness here stated, simple diarrhœa; 3 days' duration."

This was amended on March third, before the issuance of the present policy, as follows : " The last physician who prescribed for me was Dr. George B. Skiff." This takes the place of the corresponding statement in the original application, and must be con-

strued as simply stating that the last physician consulted was Dr. Skiff, without giving any date of the consultation or its cause or reason, or the sickness for which he was consulted; and construing this clause strictly against the company, there is no misrepresentation whatever. There is no evidence of the untruthfulness of this statement, as there is no evidence of any subsequent consultation with any other physician previous to the delivery of the policy. The proofs of loss and the evidence show that Dr. Forman attended the deceased in 1893 and in February, 1896, but it does not appear affirmatively that these consultations were subsequent to the unknown and undesignated date of Dr. Skiff's attendance, referred to in the amendment to the original application for insurance. *Non constat* but they were prior to the last consultation with Dr. Skiff, the date of which does not appear.

It is unnecessary to consider any question arising upon the attendance of Dr. Forman upon July third, as this was after the date when, according to our opinion, the policy had its inception.

It is not altogether clear what was the real cause of the death of the insured. The proofs of death state the cause of death as heart failure; that the health of the deceased first began to be affected July third; that the first symptom was simple colic, and the duration of the last illness five days. But there was testimony that the insured, after the first attack, had fully recovered and was attending to his ordinary business, and the learned court has found, as matter of fact, as follows: "I further find that said insured was a man of good health and bodily condition, and had not been sick for years, except from ailments of the most trifling nature, until in the afternoon of July 3rd, 1896, when he was suddenly seized with severe pains and suffered from an acute attack of colic from which he recovered, and the following day was July 4th, a holiday, and July 5th was Sunday, and he was at his office all of the following day, July 6th, 1896, attending to his business and apparently in his usual good health, and that on the night of July 6th, 1896, he was taken suddenly ill and continued ill during the night." This finding was fully justified by the oral and written evidence.

In addition to these considerations, it will be remembered that there was but one application, upon which both policies were issued. This was dated January seventh. The first policy, numbered 598,

was dated January eleventh. The amendment of the application was dated March third. The present policy was dated May second and delivered July first, and this was after the amendment of the original application. Leach, one of the agents of the company, testified that Rau held policy 598 for over six weeks before he delivered it to Tooker, and this brings the delivery to at least March seventeenth, a time at least eleven days subsequent to February sixth, the time when, in the attending physician's certificate, Dr. Forman certified that he attended the insured for herpes, and these facts were known to the company at the time when it paid the amount of the first policy. And as it paid that policy without objection, it would seem as if it had waived any invalidity or insufficiency of the proofs as to the present policy, since it expressly and in writing, on December fourth, waived any further proofs of death.

The judgment must be affirmed, with costs.

All concurred, except BARTLETT, J., who concurred in the result.

Judgment affirmed, with costs.